UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DEAN V. KRUSE and KRISTIN MCGRADE KRUSE, *Individually and on behalf of all others similarly situated*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO.: 1:10-CV-323-JD ) |
| GS PEP TECHNOLOGY FUND 2000 LP, GS PEP TECH 2000 ADVISORS LLC, and GOLDMAN SACHS & CO. LP, | ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Now before the Court is Defendants' motion for summary judgment on the only remaining claim which alleges that Defendants Goldman, Sachs & Co. LP, GS Pep Technology Fund 2000 LP, and GS Pep Tech 2000 Advisors LLC ("Defendants") breached the contract with Plaintiffs Dean and Kristin Kruse ("Plaintiffs")[1] [DE 57-60]. Plaintiffs have not responded to the motion. For the following reasons, Defendants' motion for summary judgment is GRANTED.

## I. INTRODUCTION

On September 13, 2010, Plaintiffs filed their original Complaint with Class Action Requested [DE 1]. Because the Complaint lacked a jurisdictional basis, an Amended Complaint was ordered and filed soon thereafter [DE 4]. After Plaintiffs' original attorney withdrew his appearance [DE 13] and Plaintiffs' present attorney entered his appearance [DE 16], a Second Amended Complaint was filed in June 2011 [DE 18]. After several extensions of time and various motions, a Third Amended Complaint ("TAC") [DE 32] was filed on August 26, 2011

---

[1] While the Court has not certified a class in this case, the Court has jurisdiction over this matter pursuant to the Class Action Fairness Act for the reasons previously stated and incorporated herein [DE 47 at 2-3].

alleging claims for fraud and breach of contract. On September 19, 2012, the Court dismissed the fraud claim with leave to re-file by a specified time, but denied the dismissal of the breach of contract claim [DE 47]. No amended complaint relative to the fraud claim was filed, and therefore the only claim currently pending is the breach of contract claim. On December 6, 2012, Defendants sought summary judgment on the remaining breach of contract claim [DE 57]. Plaintiffs have not contested the motion.

## II. FACTUAL BACKGROUND

Plaintiffs maintain that in 2000 they transferred from their savings $2,606,058.00 to invest in Defendants' GS PEP Technology Fund 2000, LP, a limited partnership ("the Fund"), which was sold and administered by Goldman, Sachs & Co. LP and GS Pep Tech 2000 Advisors LLC [DE 32, ¶¶ 1, 19]. Plaintiffs claim they were "assured that the future investment prospects for the Fund were excellent and that the Plaintiffs could anticipate a decent return on their investment towards their retirement." *Id*. Further, Plaintiffs were informed that they could "fully withdraw all of their initial investment, plus appreciation in the investment, on or after March 31, 2010 . . . [and] Defendants projected that the Plaintiffs' account would be worth over $10 million by the end of the ten (10) years of the Fund" [DE 32, ¶ 20]. These alleged assurances induced Plaintiffs to invest into the Fund. *Id*.

Plaintiffs' claim for breach of contract is premised on their agreement with Defendants that this investment was only to be for a period of ten years, after which the balance would be disbursed to Plaintiffs upon their demand [DE 32, ¶¶ 40-41]. According to Plaintiffs, the date of disbursement was March 31, 2010, and despite their demand for disbursement of the decreased balance of their investment, Defendants offered a sum less than the amount that remained in the account and ultimately refused to disburse any sum of money [DE 32, ¶¶ 25-27, 42]. Plaintiffs

2

did not attach any contract, agreement, or writing as an exhibit to their TAC for support, nor even explain the nature of any such contract, agreement, or writing.

However, in support of their summary judgment motion, Defendants provided the relevant contracts consisting of three confidential exhibits [DE 38, 39, 40]. Docket entry 38 is entitled "Subscription Booklet" and consists of an Investment Suitability Questionnaire, which was filled out by Plaintiffs and executed on February 17, 2000 ("Investment Agreement") [DE 38 at 13, 26], along with a "Subscription Agreement and Investment Representations" form [DE 38 at 27] dated February 17, 2000 and also signed by Plaintiffs ("Subscription Agreement") [DE 38 at 39]. Docket entry 39 is titled "Private Placement Memorandum" ("Memorandum") which appears to explain the terms of the Fund, is dated January 2000, and contains no signatures because the Memorandum was adopted by the parties pursuant to the terms of other agreements and does not have a separate signature page for investors in the Fund [DE 39; DE 59-1 at 3]. Docket entry 40 is a copy of an "Amended and Restated Agreement of Limited Partnership" ("LP Agreement") [DE 40] which was signed by Plaintiffs on February 17, 2000 [DE 38 at 40-41]. The LP Agreement indicates that Plaintiffs agreed to be bound by each and every term of the agreement "as the same may be duly amended from time to time" [DE 38 at 40].

The affidavit of Nayra Calderon Najera, a Regional Compliance Manager for Goldman, Sachs & Co. LP [DE 59-1], establishes that these documents are maintained in the regular course of Goldman Sach's business [DE 59-1 at 3]. Najera represents that Defendants and Plaintiffs agreed to be bound by the terms contained in these documents ("operative agreements"), and that there are no other agreements (written, oral, or otherwise) between Plaintiffs and Defendants. *Id*. Thus, it is uncontested that these are the only operative agreements for Plaintiffs with respect to their investment at issue in this litigation. *Id*.

3

Defendants' exhibits are offered to show that Plaintiffs' breach of contract claim must fail mainly because (1) Plaintiffs agreed to bear the economic risk of the Fund's investment for an indefinite period of time and that the investment could exceed ten years [DE 58 at 3-4], and (2) Plaintiffs were experienced investors who could bear a complete loss of their investment, understood the significant degree of risk of loss involved, and relied on no other representations or agreements other than those set forth in the relevant contracts [DE 58 at 4-8].

Plaintiffs do not contest the following facts based on the operative agreements as provided by Defendants [DE 58 at 3-8]:

### A. The Fund

The Fund's investment mission was to "seek long-term compounded returns in excess of those available" in the public equity markets by investing, directly and indirectly, in privately issued securities of high technology companies in 2000 [DE 39, Memorandum at 5]. The Fund was a private placement and therefore not open to the general public. *Id*. at 5, 9.

Investing in the Fund was not without risk. *Id*. at 52 ("the Fund is suitable only for those who desire a concentrated portfolio of private investments in Technology Companies and are willing to assume the increased risks associated with such a focus."). According to the Memorandum, the companies the Fund invested in "will often involve a high degree of business and financial risk" because they "may be in an early stage of development" or "may not have a proven operating history," or "may be operating at a loss or have significant variations in operating results," or "may be highly leveraged." *Id*. at 47. The Fund's investments were "illiquid and long-term and . . . unlikely to provide current income." *Id*. at 49.

Contrary to Plaintiffs' central allegation that the Fund promised a ten-year fixed term, because of the illiquidity of the investments the Fund made, and the uncertainty of how long they

4

would take to run their course, the Memorandum made clear that the limited partnership interests were of indefinite duration. The Memorandum specifically defined the "Term" of the investment in the Limited Partnership interests to be:

> Each of the Partnership and the Offshore Partnership will dissolve and terminate upon the *later* to occur of (i) December 21, 2010 and (ii) *one year after* the date by which all such partnership's Partnership Investments have been liquidated, *unless such partnership's term is extended* by its General Partner with the consent of a majority-in-interest of its Limited Partners.

[DE 39, Memorandum at 13] (emphasis added).

Further, the LP Agreement itself could not have been clearer that the investment cycle could exceed ten years. It defined the "Duration" of the investment as follows:

> The Partnership shall dissolve upon the *later* to occur of (i) December 31, 2010 and (ii) *one year after* the date by which all of the Partnership's Partnership Investments have been liquidated. The term of the Partnership *may also be extended* from time to time for such term as is requested by the General Partner and approved by a Majority in Interest of the Limited Partners (excluding the interest in the Partnership of any Affiliated Limited Partners from both the numerator and denominator). Notwithstanding the foregoing, the Partnership shall dissolve, wind up and terminate as set forth in Article X.

[DE 40, LP Agreement at 17] (emphasis added).

Plaintiffs also stated they understood the Fund's lack of liquidity and lack of a defined final distribution date. They represented that they had "no need for liquidity with respect to the Investor's investment in the LP Interests and no need to dispose of the LP Interests." [DE 38, Subscription Agreement at 30; DE 39, Memorandum at 49] ("The Fund's investments will be illiquid and long-term and are unlikely to provide current income, which is not an objective of the Fund."). Moreover, they represented that they understood "that [they] must bear the economic risk of [the Fund's] investment for an indefinite period of time." [DE 38, Subscription Agreement at 30].

5

## B. The Contract Terms

As previously indicated, the affidavit of Najera [DE 59-1] establishes that Plaintiffs' investment in the Fund is indisputably governed by only four agreements: (1) the Investment Agreement [DE 38]; (2) a Subscription Agreement [DE 38]; (3) the January 2000 Memorandum [DE 39]; and (4) the LP Agreement dated March 31, 2000 [DE 40].

The Subscription Agreement clearly establishes that there were no other agreements or representations made to Plaintiffs about the term of the investment, or any other aspect of investing in the Fund. In the Subscription Agreement, Plaintiffs expressly agreed that "[n]o representations or agreements other than those set forth in the Memorandum have been made to [Plaintiffs]" with respect to their investment in the Fund [DE 38, Subscription Agreement at 30]. They further acknowledged that they had "not been furnished with any offering literature or prospectus except the Memorandum." *Id*. at 29. They also agreed that they "relied solely upon the Memorandum, the advice of [their] tax or other advisers and independent investigation made by [Plaintiffs] in purchasing the LP Interests." *Id*. at 30. They further stated that "[n]o representations or agreements other than those set forth in the Memorandum have been made to [them] in respect thereto." *Id*. Finally, they represented that they were "not relying on Goldman Sachs, the General Partner, [the Fund] or the references to any legal opinion in the Memorandum with respect to individual and Partnership tax and other economic considerations involved in this investment." *Id*.

On February 17, 2000, Plaintiffs executed both the Investment Agreement and the Subscription Agreement [DE 38]. In executing those documents and as a condition to their investment, Plaintiffs made affirmative representations about themselves, their financial net worth, their investment experience, and their understanding of the nature and risks of their

investment in the Fund, and also represented that their Investment Agreement Questionnaire responses were "complete and accurate and may be relied upon." [DE 38, Subscription Agreement at 7].

Plaintiffs represented that their net worth was tens of millions of dollars; they had investments worth multiple millions of dollars; and, they had annual income that exceeded $300,000 [DE 38, Investment Agreement at 8]. They represented that they "could bear a complete loss of [their] investment in the LP Interests." [DE 38, Subscription Agreement at 30]. They also agreed that they "[are] able to bear the economic risk of loss of [their] investment in the Partnership [and that] . . . the loss of [their] entire investment in the Partnership would not materially adversely affect [their] standard of living or that of [their] family." *Id*. at 30-31. They further confirmed that they "satisf[y] the suitability requirements set forth in the Memorandum, including the requirement that the Investor be an 'Accredited Investor' as defined in Regulation D promulgated under the Securities Act." *Id*. at 30, 33 (stating they are a "'qualified client' as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended.")

Plaintiffs further represented that they understood the nature of their investment in the Fund. As a general matter, they represented that they "read, underst[oo]d[] and [were] fully familiar with the Memorandum and the LP Agreement." [DE 38, Subscription Agreement at 29; *see also id*. at 27] ("the Investor agrees to, and understands, the terms and conditions upon which the LP Interests are being offered, including without limitation the risk factors referred to in the Memorandum."). They also confirmed that they had "such knowledge and experience in financial and investment matters and in such other business matters that [they are] capable of evaluating the merits and risks of an investment in the LP Interests without the assistance of a Purchaser Representative as such term is defined in the Securities Act." *Id*. at 30.

Among the risks Plaintiffs "expressly acknowledge[d]" was that "the LP Interests are speculative investments which involve a high degree of risk of loss." [DE 38, Subscription Agreement at 31]. But, Plaintiffs represented that they could "bear the economic risk of loss of [their] investment in the Partnership." *Id*. at 30-31. The Memorandum reiterated that investment in the Fund "is expected to be highly volatile, and the Fund will involve a significant degree of risk." [DE 39, Memorandum at 8]. In a section entitled "Risks and Potential Conflicts of Interest," the Memorandum also explicitly states that:

> The Fund is intended for long-term investors who can accept the risks associated with investing primarily in illiquid, privately negotiated equity or equity-related securities. There can be no assurance that the Fund will achieve its investment and performance objectives. The possibility of partial or total loss of Fund capital will exist, and prospective investors should not subscribe unless they can readily bear the consequences of such loss.

*Id*. at 47. The Memorandum disclosed that the Fund "will not be diversified; rather its investments will be concentrated in Technology Companies," so the Fund's performance would be "closely tied to economic and market conditions . . . in the high technology sectors of the global economy." *Id*. at 48. Furthermore, far from forecasting a profitable future as Plaintiffs suggest, the Memorandum underscored and investors acknowledged that "past results" were "not necessarily indicative of future results or profits, and no representations to the contrary have been made." [DE 38, Subscription Agreement at 31; DE 39, Memorandum at 48] ("the historical performance of investment managers is not a guarantee or prediction of their future performance, which can vary considerably.")

### C. Plaintiffs' Subscriptions and Distributions

Having made the detailed representations and agreements, Plaintiffs irrevocably subscribed to a $2.5 million maximum commitment to invest in the Fund [DE 38, Subscription Agreement at 27]. Plaintiffs did not invest the entire amount of their commitment; instead, they

8

invested $1,894,787.00 in the Fund [DE 59-1 at 4-5]. They also received $847,647.99 in distributions from the Fund since their initial investment. *Id*.

### III. STANDARD OF REVIEW

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Kerri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of [a] genuine issue of material fact." *Id.* at 323. Once the moving party meets this burden, the nonmoving party may not rest on allegations or denials in its own pleading, but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be *material*, which means that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, No. 4:08-CV-69, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010).

As a federal court sitting in diversity, the Court will rely on state substantive law and attempt to predict how the Indiana Supreme Court would decide the issue presented here. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.,* 165 F.3d 1087, 1090 (7th Cir. 1999) ("Where the state

supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently.").

## IV. DISCUSSION

The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *See Rice v. Hulsey*, 829 N.E.2d 87, 89 (Ind. Ct. App. 2005). There is no dispute that an agreement between the parties existed. Moreover, there is no dispute that Plaintiffs have invested more money than they have received in distributions from the Fund (at least, up to this point). Assuming for the sake of argument that damages have been suffered, the Court must consider if the agreement between the parties was breached. Here, the Court concludes that the undisputed material facts demonstrate that there has been no breach of contract.

The construction of a contract and an action for its breach are matters of judicial determination. *Hawa v. Moore*, 947 N.E.2d 421, 426 (Ind. Ct. App. 2011) (citing *McKeighen v. Daviess Cnty. Fair Bd.*, 918 N.E.2d 717, 720-21 (Ind. Ct. App. 2009)). When construing a contract, unambiguous contractual language is conclusive upon the parties and the courts. *Id*. If an instrument's language is unambiguous, the parties' intent is determined from the four corners of the instrument. *Id*. However, if reasonable minds differ as to the meaning of the contract's terms, then an ambiguity exists rendering summary judgment inappropriate. *Plumlee v. Monroe Guar. Ins. Co.,* 655 N.E.2d 350, 354 (Ind. Ct. App. 1995) (citation omitted); *see Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.,* 865 N.E.2d 571, 574 (Ind. 2007) (holding that if summary judgment turns on the interpretation of a written document, any ambiguity that arises must be resolvable without the aid of the fact-finder).

When the clear terms of the contract contradict the allegations in the plaintiff's complaint, "the exhibit trumps the allegation." *See Thompson v. Ill. Dept. of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002); *see also Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004) (exhibit trumps the pleading when the complaint is "inherently inconsistent" with the terms of the exhibit). Simply stated, the "[t]he unambiguous contract controls over contrary allegations in the plaintiff's complaint." *See McWane v. Crow Chi. Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000). Further, where a complaint refers to a document but does not attach it, then a defendant may introduce the pertinent documents if they are referred to in the complaint and are central to the claims- as the operative agreements are here. *See e.g., Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

The undisputed facts establish that the operative agreements designated by Defendants in support of their summary judgment motion are the only agreements relating to Plaintiffs' investment in the Fund at issue in this litigation. Plaintiffs have not attempted to provide any materials or argument which would create a genuine dispute on this issue. To the contrary, the documents clearly show that Plaintiffs expressly agreed that no representations or agreements other than those set forth in the relevant documents were made to them; that they relied solely upon the Memorandum, the advice of their other advisers, and any independent investigation made by them in purchasing the LP Interests; and, that they were not relying on Defendants with respect to the economic considerations involved in the investment.

Given the unambiguous language of the only operative agreements, the Court concludes that there was no breach of contract because Plaintiffs agreed to bear the economic risk of the Fund's investment for an indefinite period of time and that the investment could exceed ten years. Contrary to Plaintiffs' unsupported assertions in the TAC, Plaintiffs never had a right to

11

demand and receive their investment after a ten year period (or as of March 31, 2010). The Memorandum and the LP Agreement specifically defined the "term" or "duration" of the investment to indicate the lack of a defined final distribution date. Moreover, the governing documents are replete with representations clearly stating that Plaintiffs' investments were "illiquid," "long-term," and "indefinite" in duration, and Plaintiffs' execution of these documents indicates they understood and agreed with these terms and conditions. The documents belie Plaintiffs' bald assertion contained in their TAC that they had a right to demand and receive their investment after a specified term, and Plaintiffs have not produced any evidence that creates a genuine issue of material fact as to the term of their investment.

Additionally, the decline in value of Plaintiffs' investment did not amount to a breach of contract because Plaintiffs were experienced investors who could bear a complete loss of their investment, understood the significant degree of risk of loss involved, and relied on no other representations or agreements other than those set forth in the operative agreements. The documents show that Plaintiffs "expressly acknowledged" that they understood that these were speculative investments which involved a high degree of risk of loss. The Memorandum reiterated that investment in the Fund was expected to be highly volatile and would involve a significant degree of risk. The Memorandum explicitly stated that there could be no assurance that the Fund would achieve its investment and performance objectives and that the possibility of partial or total loss of Fund capital existed, and it warned that prospective investors should not subscribe unless they could readily bear the consequences of such loss. In short, the plain and unambiguous terms of the operative agreements contradict Plaintiffs' unfounded claims in their TAC because nothing in the governing documents guarantee Plaintiffs will receive any return on their investment. Instead, the relevant documents establish that Plaintiffs were financially

sophisticated investors who understood the terms involved in their investment and the fact that they could lose their investment.

"[I]t is well-established in Indiana that 'a person is presumed to understand the documents which [he or she] signs and cannot be released from the terms of a contract due to [his or her] failure to read it.'" *Cottey v. Brink's Home Sec., Inc.*, No. 1:09-CV-1116-TWP-MJD, 2011 WL 11526, at *5 (S.D. Ind. Jan. 4, 2011) (quoting *Clanton v. United States*, 686 N.E.2d 896, 899-900 (Ind. Ct. App. 1997)). While some exceptions may apply to this rule, Plaintiffs have produced no evidence to suggest that any such exception might apply. *See id.* (noting exceptions to the enforcement of liability-limiting clauses to include unequal bargaining power, an unconscionable contract, or a contract that affects the public interest or contravenes public policy); *Fultz v. Cox*, 574 N.E.2d 956, 958 (Ind. Ct. App. 1991) (noting fraud as an exception).

Thus, because no genuine dispute as to any material fact exists relative to Plaintiffs' breach of contract claim against Defendants, summary judgment is appropriate.

## V. CONCLUSION

Based on the foregoing, it is clear that the operative agreements which Plaintiffs indisputably executed demonstrate irrefutably that Defendants have not breached any contractual duties to Plaintiffs. Accordingly, Defendants are entitled to judgment as a matter of law, and for that reason the Court GRANTS Defendants' unchallenged motion for summary judgment [DE 57].

SO ORDERED.

ENTERED: <u>April 2, 2013</u>

<u>/s/ JON E. DEGUILIO</u><br>
Judge<br>
United States District Court